The single point in the case is, whether the defendants' loss, adjusted before proceedings were commenced to dissolve the company, can be set off against their premium notes given to the company, as a consideration for the policy on the "Galena" and other policies. If it can, it is because it is equitable and just to do so, and no rights of third persons intervene. It may be conceded, also, that the plaintiff, as receiver, stands in the same situation that the company itself *Page 160 
would, had the action been prosecuted by it (being in fact insolvent) to recover the amount of the notes.
I suppose that, ordinarily, when an insolvent insurance company (no mutual relations and obligations existing among its corporators) seeks to enforce payment of a debt owing to such company for insurance premiums or otherwise, the debtor is equitably entitled to set off an adjusted loss due to him against the claim of the company. It would be inequitable to compel full payment by the debtor, and leave him to lose his debt which had accrued before the insolvency of the company. Here, however, no superior controlling equities would arise, or the rights of others intervene. It is different where the company is a mutual one, and the insured a member or corporator — an insurer as well as a party insured — and the association has no dealings in regard to insurances except with its own members. The party has entered voluntarily into engagements with others modifying, or entirely changing, as between themselves, the effect or application of the general rules of law or equity in regard to set-off. In a company of mutual insurers, each sufferer is bound to make compensation as well as to receive it. He occupies the double relation of debtor and creditor, and it would be inequitable to allow him, when the funds of the company are not adequate to pay all losses, to set off his entire demand; thereby getting more than his share of, and decreasing, a common fund to which all the creditors, pro rata, are entitled. Each member is interested in the premiums as well as losses of all the others, and the premium paid by each is saddled, as it were, with its proportionate share of the claims of all others. The premium, whether paid or secured to be paid, is withdrawn from his control, in contemplation of law, and placed in a common fund, not subject to his claims only, but those of all others in the company; he in turn, having a similar claim on the premiums of his associates. The members of the association virtually agree to insure each other, and provide a common fund to indemnify in case of loss. As all have contributed to this fund they have a community of interest in it; and each member having his *Page 161 
proportionate share of the losses, is entitled to his proportionate share of the profits, if any are realized. It may be that one member may draw from the premiums paid by other members into the common fund, if the association be prosperous, not only the amount of his losses, but as large a proportional share of profits as those whose transactions with the company created no loss at all. In such a case, if insolvency eventually overtakes the association, it would be highly unjust to allow him to set off a loss against premiums that happened to be unpaid, and that should be placed in the common fund. Indeed when the assets of the company are inadequate to the payment of the losses of all its members, the effect of permitting a sufferer to set off his loss in full against his premium notes (which are his contribution to the means of the company) is not only to confer a benefit without making compensation, but to take from the shares of his associate sufferers in the common fund; to which fund he and they are ratably entitled. Undoubtedly, a premium paid, or agreed to be paid, by a member of a company formed on the mutual principle, must bear its proportionate share of the losses of the company, and cannot be applied exclusively to the individual debt of the party owing or paying it. So long as the company be solvent no practical injury would result from setting off a loss against the premium; as no preference would be given to one member or creditor over the others, for all would be paid in full. But if the association were insolvent, to permit the set-off to be made would be to give an unjust preference to one creditor over the others. In Hillier v. The Alleghany MutualInsurance Company (3 Barr's Rep. 370), it was adjudged that the loss of a member of a mutual company cannot be set off to an action brought by the company on his premium note, when the funds of the company were not adequate to pay all losses; and that the plain and practical plan of settling the affairs of an insolvent company of mutual insurers, was to liquidate its means and responsibilities separately.
The defendants in this case became members of a mutual insurance company, by effecting insurance therein. It was one *Page 162 
of that class of mutual companies, authorized to commence and transact an insurance business on the cash premiums paid by the associates. The first premiums paid were never to be withdrawn, but were pledged for losses and expenses of the company. The dealers and corporators were to pay their premiums in cash; and such premiums, and the income derived from their investment, were to constitute a fund for the payment of the losses and expenses of the company. To ascertain the profits of the company, the losses and expenses after the first year were annually to be deducted from its earnings, arising as well from premiums as from the income derived from the investment of premiums; and the balance, if any, was to be deemed the amount of net profits; and thereupon every dealer or insurer was to be credited with such a proportion of the net balance as the amount of earned premiums paid by him should bear to the whole amount of earned premiums received by the company during the year; and a certificate of profits for the amount so credited was to be issued by the company to such dealer or insurer, with a provision that the amount named therein was liable for any future loss by the company. (Laws of 1841, ch. 252; Laws of 1842, ch. 132.) The charter, in effect, directed the placing the receipts from premiums together in a common fund, and from this fund the losses, also placed in common, were to be deducted. It is obvious that each dealer became interested in all the premiums paid by other dealers, as well as in the losses sustained by the company under policies issued to other dealers. It might be that a party whose dealings with the company resulted in a large loss to it, not only would have his losses paid out of the premiums from others, but actually participate equally with them in the profits to which he had not contributed. The defendants, when they became dealers and members of the company, instead of paying the premiums in cash, as was contemplated by the charter, gave time notes for such premiums, which could only properly be received by the company in lieu of cash. Had they dealt as the charter contemplated, the question now before us could not have arisen. Now, when the company is insolvent, or unable to pay all its liabilities, instead *Page 163 
of making good their contributions to the mutual fund for the payment of losses and expenses, in which each of the associates have an interest — as they have undertaken to do — and receiving their pro rata share of the means of the company, they seek indirectly as creditors to obtain a preference over their associate creditors. The practical effect of setting off the loss in full on the Galena, would be to exhaust the defendants' contributions to the common fund for their exclusive benefit, give them as members of the association a disproportionate share of the fund, and deprive the other members and creditors of their equal proportionate share. In short, because they have suffered their premium notes to remain unpaid, they are thereby to obtain a preference over their associates. There is no equity in this as between the associates of a company of mutual insurers.
There is no doubt that in January, 1854, when the loss on the Galena was adjusted, the company was unable to pay all its liabilities. The defendants, in fact, admitted this, by agreeing to be paid the return premium on the policy "ratably out of the assets of the company when divided." At that time, as members of the company, they contemplated a pro rata division of its means, and agreed to a cancellation of all the policies for which the premium notes were given (including that on the Galena), stipulating for a "return premium" on each. It is difficult, however, to perceive how the company could retain or pay back any portion of a premium never received or paid into the common fund. The agreement clearly imported that the defendants should pay their premium notes, or contributions to the common fund in full, and were to be entitled to a return of a stipulated amount of such contributions, to be paid, ratably with other creditors, on a division of the assets of the company. But be this as it may, it was an admission by the defendants that the association was at that time insolvent, and its means inadequate to discharge in full all the claims of its members and creditors. When such a state of things exists in a company of mutual insurers, whose members have each an equal interest in its means, and are each creditors as well as *Page 164 
debtors, to allow one member or creditor to get more than his share of the common fund by setting off his individual claim in full, and thereby decreasing the shares of his associate creditors, would be unjust and inequitable. Yet this is the right that the defendants claim they are equitably entitled to. Having voluntarily engaged with others in a mutual enterprise, and for mutual benefit — the insurance of each other — and each dealer or corporator having an equal interest in the common fund provided as well for the payment of his losses as for a participation in the profits — they have no equitable right, in case of insolvency, to an exclusive appropriation of their premiums or contributions to the funds of the company, to the payment of the losses under the policies for which such premiums were given; but, as members, are obligated to pay such premiums into the common fund, and are only justly entitled to their pro rata
share of it in the payment of losses. The referee therefore correctly decided that the defendants could not set off in full their loss on the "Galena," but that they were bound to pay their premium notes, and come in, as they proposed to do in regard to their other claims, in a pro rata division of the assets of the company amongst all its members and creditors. What, as mutual insurers, they were ratably entitled to, could only be ascertained after all the means of the association were called in, and the demands upon it liquidated.
It is said that the cases in the books relate to mutual fire companies and have no application to marine companies. If by this is meant marine companies not formed on the mutual principle, the observation is correct. But there may be mutual companies to make marine insurance as well as against loss or damage by fire; or they may be empowered to take both species of risks. The company of which the defendants' firm were members was of the latter description. (White v. Haight, 16 N.Y., 310; Laws of 1841, ch. 252.)
The judgment of the Superior Court should be affirmed.