## Case No. 12,435.

### SCAMMON v. KIMBALL.

[5 Biss. 431; 6 Am. Law T. Rep. 424; 8 N. B. R. 337; 18 Int. Rev. Rec. 118; 4 Chi. Leg. News. 284; 2 Ins. Law J. 775; 5 Leg. Gaz. 321.] [1]

Circuit Court, N. D. Illinois. Sept., 1873. [2]

CORPORATIONS—UNPAID SUBSCRIPTIONS TO STOCK—SET OFF—RULE IN BANKRUPTCY—FIDUCIARY DEBTOR.

1. A claim against an insurance company for loss under its policies cannot be a set-off against an unpaid subscription to its capital stock.

2. Though the charter of the company only required the stockholder to pay in a part of his subscription, the balance was in the nature of a trust fund for the creditors of the company.

3. Though in a solvent company the debts might be considered mutual and the set-off allowed, the fact of insolvency changes the rule.

4. A stockholder coming into equity for relief should first do equity by making good his share of the capital stock. Lawrence v. Nelson, 21 N. Y. 158, approved.

5. Though the bankrupt law recognizes rights of set-off, it was not intended to enable one occupying a fiduciary relation to take advantage of the bankruptcy of the company.
[Cited in Jenkins v. Armour, Case No. 7,260.]

6. Set-off cannot be allowed except between parties sustaining the simple relation of debtor and creditor, and this principle excludes the case of the treasurer of an insurance company.

This was a bill in equity by Jonathan Young Scammon, against Mark Kimball, assignee of the Mutual Security Insurance Company of Chicago, to set off his claims against the company for losses on policies of insurance, against his liability on unpaid subscriptions to the capital stock of the company, and his indebtedness to the company for money deposited with him, and to enjoin the prosecution of suits at law against him by the assignee. At the time of the fire in Chicago, on the 8th and 9th of October, 1871,

---

[1] [Reported by Josiah H. Bissell. Esq.. and here reprinted by permission. 4 Chi. Leg. News. 284. contains only a partial report.]

[2] [Reversed in 92 U. S. 362.]

Scammon held several policies of insurance against the company, as indemnity for loss by fire, upon which he sustained losses to the amount of over $50,000. Its losses in that fire rendered the company insolvent, and it was shortly afterwards put into bankruptcy by its creditors. The assignee, while admitting the liability of the company, denied that the debt could be set off against the demands of the company, and filed a cross-bill asking for a decree against Scammon for these demands. The claims of the company against Scammon were, first, for unpaid subscriptions to the capital stock; and second, for money on deposit with him as a private banker. The first claim arose as follows: The charter of the company authorized the subscribers to the stock to pay a small percentage of their subscriptions in money, and to give note or personal security for the remainder, and declared that when $50,000 of the capital stock was subscribed, and five per cent. paid, and the remainder secured, business could be commenced. The complainant was one of the original subscribers for a considerable amount of the stock and paid in one installment, and gave promissory notes to the company, secured as required, for the remainder. This balance had never been paid in. The other demand was as follows: From the organization of the company, in 1864, the complainant had been a director and a member of the executive and financial committee, and one of its chief managers. After the stock was subscribed and a portion of it paid, he proposed to take the amount, hold it subject to call, and pay interest at ten per cent. This offer was never distinctly and in form accepted by the board of directors, but the complainant, being a banker at the time, held the money, and interest was credited on the current balances. This was acquiesced in by the directors and by the company for some years. There were other assets which appear at first to have been paid to the treasurer or secretary, and deposited to the credit of the company in the Mechanics' National Bank, of which the plaintiff was president. The money in his hands was used as required. In 1868 a further call was made on the stock subscription, and afterwards, what was obtained, as well as other funds, appears to have been deposited in the Mechanics' National Bank to the credit of the company. In 1870, the complainant was elected treasurer, and so continued up to the time of the fire, October 8 and 9, 1871. In 1870, the complainant objected to paying ten per cent. interest, and after July, 1870, the interest was credited to the company at only eight per cent. After his election as treasurer, the money of the company was permitted to remain in his hands as before, by general acquiescence, and no change was made in the books or reports. No bond or security was ever given by Mr. Scammon as treasurer, nor was any ever required of him.

There was nothing on the books of the company to show that the money was loaned to the complainant, but they contain reports made from time to time, with interest credited. The books, reports, and all the records of the company, returned the money in the hands of the complainant as cash, or cash assets, or cash in bank, and after September, 1869, all money was charged to the treasurer. At the time of the fire the complainant had in his hands, under the circumstances above mentioned, the sum of $39,-188.33, belonging to the company.

Geo. W. Smith and Samuel W. Fuller, for complainant.

The transaction with complainant was a loan to him. The charge for interest and its payment, the method of depositing and calling for moneys, etc., are all of the character which dealings between borrower and lender naturally and usually bear. No trust attached to the moneys in the hands of borrowers. Prior to the year 1870, and to his appointment as treasurer, complainant stood as any other person to the company, competent to contract with it. and to become a borrower of its moneys. The office of treasurer only required him to keep the custody of moneys which came to him as treasurer. It did not prevent him from becoming either a debtor or creditor of the company. The present relations of the complainant and defendant are the result of an agreement made by the company when solvent, and to this agreement all the officers and stockholders of the company were parties. The policyholders who are now creditors of the company, have received, or are about to receive, the gains which accrued from it, and the complainant should not be excluded from the privileges which belong to a borrower of money having a cross demand. He holds these moneys under an agreement to pay interest, which fact constituted him a debtor of the company, and gives·him the right to make this set-off upon the principles established in the case of Drake v. Rollo [Case No. 4,066], heretofore decided by the court.

Williams & Thompson, for assignee.

The evidence of an arrangement or contract was incompetent, having no tendency to establish a contract of loan. Directors, when assembled, must act as a body, and conversation among them is no evidence of their action. Butler v. Cornwall Iron Co., 22 Conn. 335; Essex Turnpike Co. v. Collins, 8 Mass. 292; Bank of Columbia v. Patterson's Adm'r, 7 Cranch [11 U. S.] 299. The charter of the company forbids the loan of the capital stock of the company, except upon security. The contract, therefore, which the complainant attempts to establish, is forbidden by law, and is void. For some general principles applicable to the construction of charters. see Com. v. Erie & N. E. R. Co., 27 Pa. St. 339; Auburn & C. Plank

Road Co. v. Douglass, 9 N. Y. 444; Bank of Augusta v. Earle, 13 Pet. [38 U. S.] 519–587. Charters of corporations are strictly construed by the courts, and no powers are held to be granted by them except those expressly given, or such as clearly exist by necessary implication. The mode of using the capital of the company is determined by the charter. If the transactions in reference to the funds of the company amount to a loan to one of the directors, without any security whatever, and without any stipulation as to time, then there was a violation of the charter, the contract was void, and the fund was still the fund of the company, in the hands of a director, not invested by contract of loan or otherwise. Directors of corporations are agents and trustees, and their contracts with the corporation are regarded, with disfavor, and scrutinized with jealousy and suspicion. The strictest proof of the fact of the contract, and of its fairness and justice, is required. The fund which was taken by the complainant was a trust fund for the payment of the debts of the company. It was charged with this trust before it was taken, and it could not be divested of it by the manipulations of the complainant. Curran v. State of Arkansas, 15 How. [56 U. S.] 304; Wood v. Dummer [Case No. 17,944]; Vose v. Grant, 15 Mass. 505; Spear v. Grant, 16 Mass. 9; Nathan v. Whitlock, 3 Edw. Ch. 228, 9 Paige, 151; Richards v. New Hampshire Ins. Co., 43 N. H. 263; Koehler v. Black River Falls Iron Co., 2 Black [67 U. S.] 715; Robinson v. Smith, 3 Paige, 222; Charitable Corp. v. Sutton, 2 Atk. 400. When it was reported to the stockholders and to the public that these funds were "in hand" or "in bank," the stockholders and the public had a right to assume and believe that so much, at least, of the company's assets were available for the payment of liabilities without set-off, defalcation or discount of any kind; and when they are sought to be charged with a set-off by one of the largest creditors, and one occupying the most intimate relations to the company. the transactions by which such a state of things is brought about, are, in law, fraudulent, and cannot be sustained. One holding a position of trust cannot use it to promote his individual interests by buying, selling. or in any way disposing of the trust property. Butts v. Wood, 37 N. Y. 317; Coleman v. Second Ave. R. Co., 38 N. Y. 201. One occupying the double relation of manager and creditor of a bank, cannot bind the bank by any act of his concerning his own funds. Claflin v. Farmers' & Citizens' Bank, of Long Island, 25 N. Y. 293. As to the effect of the relation of a director to the corporation upon contracts made by him with his company, see Stacy v. State Bank of Illinois. 4 Scam. 91; Benson v. Heathorn, 1 Young & C. Ch. 326. A treasurer is a trustee in the strictest sense of the term, and trustees cannot borrow the trust funds. Perry, Trusts, § 453, and cases

cited in note 9; Ex parte Lacey, 6 Ves. 626; Pocock v. Reddington, 5 Ves. 794.

George W. Smith, in reply.

The power of the directors was limited only by their discretion in the performance of their duties. Sess. Laws Ill. 1853, p. 394, § 4. The non-recorded acts of a corporation may be proved by parol, and it may be bound by an implied contract, provided such act is within the scope of its authority. Abb. Dig. Corp. 223, 281; Maher v. City of Chicago, 38 Ill. 266; Langsdale v. Bonton, 12 Ind. 467. The company had power to make this contract. "The capital stock may be loaned upon promissory notes or bills of exchange, or otherwise, not having more than twelve months to run." Sess. Laws 1853, p. 396, § 13. That the evidence of indebtedness in the form of a note is wanting, is not material, the essential thing being the personal responsibility of the borrower. The account kept by the company with the complainant was a sufficient compliance with the law, and, further, the words "or otherwise," warranted a lending in the manner now in question. Directors are not, by reason of their office, incapacitated from dealing with the corporation as individuals. The same rules apply here that apply to trustees purchasing of the cestui que trust. And the trustee may purchase from the cestui que trust, provided there is a distinct and definite contract, and one in which there is no fraud and no advantage taken. Beeson v. Beeson, 9 Pa. St. 280; Davoue v. Fanning, 2 Johns. Ch. 252. None of the cases cited by the defendant on this point militate against the position assumed by complainant. The stockholders repeatedly applied the interest moneys derived under this contract, as dividends upon the stock notes, and recognized the agreement in every way in which it was possible to do so. The case of Drake v. Rollo [supra], recognized the equitable claim of the complainants in that case, although one of them was at the time the chief officer of the company. His appointment as treasurer made no change in law in the position of the complainant under the contract, as it made none in fact. If there were any disabilities resting upon complainant, the stockholders might, and did, waive them.

DRUMMOND, Circuit Judge. The first question is, whether the plaintiff has the right to set off his losses under policies of the company against his subscription to the stock. In one sense, what the plaintiff owes the company on his stock is a debt due the company. What the company owes the plaintiff on his policies of insurance, is a debt due the plaintiff. The debts are mutual, in that they exist from one to the other reciprocally. And if the debt due from the plaintiff were an ordinary debt, then, as we have already decided in the case of Drake v. Rollo [Case No. 4,066], the set-off would be allowed, although

the result would be to pay the plaintiff his claim against the company in preference to other creditors. We are to apply the bankrupt law to the law of the state creating the corporation. The charter authorized the company to commence business on the payment of five per cent. of the amount subscribed, provided the payment of the remainder of the stock was secured.

The purpose of this was to accommodate the stockholders, by permitting secured promises to pay to stand in the place of the money. It was still intended as a fund to protect the creditors of the company, and the charter pointed out the special manner in which the fund should be made available in case of necessity, and which has been followed in this case. So long as the company was solvent, there might not be any serious objection to the stockholder insisting that his loss on a policy should be an answer to a call to pay his subscription to the stock, because if he were to pay his subscription, the company would be obliged immediately to refund to the extent of the loss. In that case no one is injured by the allowance of the set-off. But where the company is bankrupt, it is different. Some one must sustain a loss, and the question is, whether the stockholder who has not paid his stock subscription, and who happens to have a policy on which the company is liable, shall bear his share of the loss, or shall be paid in full to the extent of his subscription. Does the fact of the solvency or bankruptcy make no change in the rule? We think it does, and that there is a difference in principle between the two cases. We have the right to judge of causes from their effects, and to reason accordingly, and certainly we ought not to sanction a rule which produces so much loss to the general creditors of the company, unless by following a different course we trench upon some settled principles of law or equity. Where a party borrows from the capital of the company, takes out a policy, sustains a loss, and in case of insolvency and bankruptcy, claims to set it off, we allow the set-off because he is an ordinary debtor of the company, and therefore comes within the rule that one debt answers another, however hard it may occasionally be, and doubtful on general principles of ethics. But in this case the plaintiff is not an ordinary debtor of the company. The charter has permitted him to retain a part of the capital of the company, and hold it in trust for the creditors. And, it seems to us, that to allow him, under the circumstances of the case, to pay himself in the way he seeks for his losses under the policies, would enable him to take advantage of his fiduciary relations, and obtain a preference over other creditors, not warranted by the equitable principles of the bankrupt law, and contrary to the manifest intent of the charter of the company.

In a court of equity, as a set-off may be allowed which is not sustainable at law, so we suppose, though generally equity follows the

law, there may be a set-off, technically good at law, which, owing to the relations of the parties, may not be admissible in equity. In this case the plaintiff comes into a court of equity for relief, and we think he should first do equity by making good his share of the capital stock, on the strength of which the company obtained its credit, and was enabled to start in business. This has become equity, because he is in one sense a trustee of that fund, and because, further, the company is insolvent and in bankruptcy.

Some very late English authorities were cited by the plaintiff's counsel, which it is insisted, are decisive of this case in favor of the set-off.

The first was In re Duckworth (1866–67) 2 Ch. App. 578. It is difficult to comprehend this case fully without an examination of the various statutes referred to. The party had subscribed for certain shares of stock in a company; he was also a creditor. The company was wound up under a special statute. Afterwards the party made an assignment for the benefit of his creditors, which was registered in bankruptcy. The question was between the representative of the company, under the winding-up act, and the trustees, under the bankruptcy registration, as to the right of the latter to set off the debt from the company to the party, against calls for the subscription, and the court held that the set-off was allowable, on the ground apparently that the case was one of ordinary mutual debts, and so within the statute in bankruptcy as to set-off. It was admitted that if the court of chancery, as such, had been adjudicating the case, the set-off would not be allowed, because the true construction of the winding-up act cut it off. But treating it as a court of bankruptcy, and not as a court of equity, and independent of the differences between that case and this, the reasoning of the court is not very satisfactory. The judge merely says, that it is his opinion that there would be a set-off under a particular section of the statute.

The other case is In re Universal Banking Corp. (1869–70) 5 Ch. App. 492, and is similar to the first and relies upon it. So far as these cases show that a subscriber to the stock of a company may set off a demand due from the company against his subscription, under the circumstances set forth, there may be certain analogies between those cases and this, though the debts are treated throughout as ordinary debts, and no consideration seems to have been given to any relation of trust existing between the parties. And besides, as already intimated, there are various statutes referred to, which may have more or less affected the views of the court. The winding-up act seems to concede that the principle of set-off, in case of contribution, is wrong, as it prohibits it.

These cases were both decided after the passage of our bankrupt law, and therefore could not have entered into the considera-tion of the law makers. But there are some decisions in this country which do not agree with the principle of those late English cases.

It seemed to be admitted by the counsel for the plaintiff, that in the case of mutual companies, so-called, the rule did not apply of allowing set-off. One case may be referred to—Lawrence v. Nelson, 21 N. Y. 158—where the party had given what is termed a "premium note," and had sustained a loss—one a debt due him from the company, the other by him to the company—and he sought to set off his claim on the policy against his premium note, and the court held that this could not be done in that case, because the note constituted a part of the capital of the company, and in case of insolvency to suffer it to be done would be giving one creditor an unfair advantage over another.

The bankrupt in that case was called a mutual company, though technically a stock company, but we are somewhat at a loss to understand the alleged difference between the two cases; it is true we can call one a joint stock company and the other a mutual company, but names do not change things. In both the "bills payable" constitute a part of the capital of the company, and a trust fund for the benefit of creditors. In both the party owing the bills receivable has met with a loss on a policy of the company. The difference, if any, seems to be in favor of the premium note as claiming a set-off, because that is given for the policy, and by a species of arrangement stands indirectly as a part of the capital, whereas here the bills receivable have to be treated directly as a part of the capital and were given with that special purpose. It seems to us that the argument of the court in the case of Lawrence v. Nelson applies to this case.

It is said that the bankrupt law has not taken away any of the rights of set-off, but has recognized and enforced them. That is so, but the bankrupt law [of 1867 (14 Stat. 517)] was not intended to encourage anything inequitable, or to enable one to take advantage of the bankruptcy of an individual or of a company, to obtain payment in full, while others could only have a pittance, and especially when those seeking the advantage occupied relations of trust.

It follows, from what we have said, that we are of the opinion that the plaintiff has not the right in equity to set off his losses on the policies against his liabilities for the payment of the stock of the company. We think that the obligation of every person who subscribes and owes for stock in such a company as this, is, in case of its insolvency, to pay what he owes for the benefit of the creditors.

The other question is as to the equitable right of set-off of the claims under the policies against the funds which the plaintiff held as the treasurer of the company. Here the position of the plaintiff was unquestionably that of trustee. The only point is, whether that was changed by the contract, or,

rather, understanding of the parties. It may be admitted that the fair inference is that the plaintiff had the right to use the money, because the payment of interest implies that; but it is impossible to consider this part of the case fairly, without bearing in mind the peculiar relations of the parties to each other. If the plaintiff had authority to employ the funds, as treasurer, he was obliged to have them always ready to answer the necessities of the company. He was still, as to them, a trustee, and not an ordinary debtor of the company. It was the case of a trustee using trust funds with the consent of the cestui que trust, but always on the condition that they were to be so used that he could meet the object of the trust.

The evidence shows that at the time of the fire the plaintiff had in his hands the funds of the company. It was as treasurer. Having met with losses on his policies, he claims the right, so to speak, of sequestering the funds in his hands as treasurer to answer his losses as a general creditor of the company. If we concede that this may be permissible in case of an ordinary debtor, we think it would not apply to one occupying the situation of this plaintiff. He would be receiving the obligations of the company upon different terms from an ordinary policy-holder, and he would occupy a vantage ground over others.

There are several difficulties in the way of a set-off on the special facts of the case. The plaintiff was elected treasurer in 1870. Whatever arrangement was made, if at all, was prior to that time. The most that can be said is that after he was elected treasurer, the funds in his hands, while they were, from time to time, reported as cash or capital, drew interest, which was accounted for, and this with the acquiescence of those who may be presumed to represent the company. There was no distinct contract made with him while he was treasurer which would constitute him the debtor, and nothing more, of the company.

The plaintiff was not only the banker of the company, but its treasurer, considered as sustaining those relations to the company pertaining to the office. It is very clear that whatever may have been the view of the plaintiff, the directors and the company did not regard the plaintiff as the mere borrower of the funds in his hands, and before a set-off would be admissible as between the company and its treasurer, in case of the insolvency or bankruptcy of the former, there ought to be satisfactory evidence that he, as to the money, had taken the position of an outside party; in other words, that he had, as to the money, ceased to be the treasurer of the company.

We need not refer to the question, whether if it was a loan to the treasurer by the directors, it was a violation of law, and therefore invalid. We prefer to place it on the ground that under some of the conceded facts of the case, the set-off is not maintainable, unless there is established the simple relation of debtor and creditor. This, we think has not been done, and therefore we overrule the claim of set-off.

The original bill will be dismissed, and a decree will be rendered for the assignee on the cross-bill for $54,145.90, the amount due on both demands.

[On appeal to the supreme court, the decree of this court was reversed. 92 U. S. 362.]

NOTE. As to the right of set-off in cases where assured of an insolvent insurance company are debtors of the corporation, see Drake v. Rollo [Case No. 4,066]; Hitchcock v. Same [Id. 6,535]; Sawyer v. Hoag [Id. 12,400], affirmed by supreme court in 17 Wall. [84 U. S.] 610. This last case is closely allied to the text. Consult Weston v. Barker, 12 Johns. 276.