## THE BUFFALO FORGE COMPANY *vs.* THE MUTUAL SECURITY COMPANY.

Third Judicial District, Bridgeport, April Term, 1910.
HALL, C. J., PRENTICE, THAYER, RORABACK and ROBINSON, Js.

An insurance company which issues a policy on an application containing ambiguous, indefinite, or imperfect answers to questions propounded therein, thereby waives its right to object to the answers upon the ground of such defects.

Upon a written application of the plaintiff for insurance against loss or damage arising from a suspension of its business caused by a strike of its employees, the eighth question asked was whether the plaintiff had a union shop, and if so, how many and what unions it recognized; to which the plaintiff replied: "Only so far as the National Foundrymen's Association and The National Metal Traders Association." In response to further questions the plaintiff stated that it was a nonunion shop in its forge and blower department, and in its iron and pattern departments; and that it was a member in each of the above named national associations, which, as found by the trial court, were not unions but organizations of manufacturers created for the purpose, among others, of treating with trade unions. *Held* that under these circumstances the answer to the eighth question was correctly construed by the trial court to mean that the plaintiff's factory was a "union shop" and recognized "unions" only in so far as that resulted from its membership in the two national associations referred to in such answer.

The election of such an insurance company to accept the premium tendered for a policy of insurance, after having been fully informed by the assured of a threatened strike by his employees, is a waiver or estoppel of its right to urge a forfeiture of the policy upon the ground that the nonexistence of any dispute between the assured and his employees, as affirmed in the application, was a warranty

Buffalo Forge Co. *v.* Mutual Security Co.

that such condition should continue from the date of the applica-
tion to the delivery of the policy.

Advantage may be taken of an estoppel *in pais* without pleading it.

In the present case the policy provided that if a strike caused an entire
suspension of production, the insurer should be liable for loss of
net profits and for fixed charges, to an amount not exceeding $166⅔
per working day, and that if the suspension was only partial, the
insurer should be liable for that proportion of the net profits and
fixed charges which the production so prevented from being made
bore to the average daily product, not exceeding in any event the
amount insured; that the average daily product should be deter-
mined from the amount of goods produced during the twelve months
next preceding the strike; and that losses should be computed from
the date of the strike until the assured was able to resume his daily
average production. *Held:*—

1. That the net profits of the year preceding the commencement of the
strike furnished the basis or standard for computing the loss, as
well for a partial, as for an entire, suspension of production, and
that the insurer was therefore liable, in case of a partial suspen-
sion only, for such proportion of the net profits and fixed charges
as the production prevented by the strike bore to the average daily
production, not exceeding, of course, the amount insured.

2. That the trial court committed no error in deciding that "fixed
charges" included such expenses as must necessarily be incurred,
not only to protect and conserve the plant, but also to maintain the
organization in such a state of efficiency as would enable it to resume
normal production without substantial delay after the strike was
ended or as the strike might be broken by a gradual return of em-
ployees.

In stating the plaintiff's production for the year preceding the strike,
and its average daily product during that period, the trial court
expressed them in dollars and cents, as measured by its sales, in-
stead of the amount of goods or merchandise manufactured. *Held*
that inasmuch as the average sales per day for the year in ques-
tion were found to represent with substantial accuracy the average
daily product of the plaintiff measured in money, the method fol-
lowed was fair and just to both parties; especially as the contract,
on the face of it, did not contemplate absolute accuracy in these
particulars.

Argued April 22d—decided July 12th, 1910.

ACTION upon a policy of indemnity against loss and
damage resulting from a strike of the plaintiff's em-
ployees, brought to and tried by the Superior Court in
New Haven County, *Gager, J.;* facts found and judg-

ment rendered for the plaintiff for $29,449, and appeal by the defendant. *No error.*

*Terrence F. Carmody,* for the appellant (defendant).

*John K. Beach,* with whom was *Moses Shire* of Buffalo, for the appellee (plaintiff).

ROBINSON, J.   Some of the reasons of appeal in this case relate to alleged breaches of warranties in the "schedule of warranties by assured," set out in the policy, and some to claimed concealments and misrepresentations of alleged material facts and circumstances; and some errors are claimed in the construction placed upon those portions of the policy of insurance which relate to the amount recoverable, and to the mode in which such amount should be calculated.

First, we desire to say that the application for a correction of the finding, and the criticisms based thereon, have been examined, and we find no occasion for any alteration of the character asked for.

Taking the other matters in their order, we will first consider those reasons of appeal having relation to the claimed breaches of warranties and concealments and misrepresentations of material facts.   The nature and novelty of this kind of insurance, and the numerous and interesting questions raised, seem to render it necessary to go somewhat into detail to define properly the attitude which this court has taken with reference to them.

It appears from the record that the plaintiff, on or before the first day of April, 1906, was a New York corporation, and engaged in the manufacture of forges, blowers, engines, etc., at its factory located in Buffalo, New York.   It also appears that the defendant, on and before May 1st, 1906, was a Connecticut corporation organized under the law of this State, with power to

make contracts of insurance to protect, indemnify, and guarantee persons, firms, or corporate bodies engaged in the business of manufacturing, against any loss or damage resulting directly or indirectly from any interference with or interruption or suspension of business, or the use and operation of any manufacturing establishment, in whole or in part, by reason of a strike of the employees. It further appears that on April 9th, 1906, the defendant's agent called upon the plaintiff in Buffalo and solicited the insurance in question, and that the application for the policy in suit, containing the "schedule of warranties," was executed April 9th, 1906.

The policy itself was executed by the defendant, and on May 1st, 1906, mailed to the plaintiff, and received by the plaintiff at Buffalo on May 2d, 1906.

The plaintiff was a member of the Buffalo Foundrymen's Association, a local association affiliated with the National Foundrymen's Association, and was also a member of the so-called National Metal Trades Association. The Buffalo Foundrymen's Association and the National Foundrymen's Association, just referred to, recognized, dealt, and negotiated with the moulders' union and other unions, through their officers; and the plaintiff was, prior to and during the entire year of 1906, a member of all of said associations, and recognized unions through said associations, but did not recognize or deal with unions in any other way, and did not operate any department of its factory as a union shop any further than as above stated, and the plaintiff was a union shop only to the extent indicated by its membership in said associations.

These are some of the material facts found by the trial court as bearing upon particular interrogatories and answers contained in certain paragraphs of the "schedule of warranties," which the defendant now

claims were not truthfully answered by the plaintiff. The defendant claims that questions 7 and 8 are of this class, and, further, that the language employed by the plaintiff in answering the eighth question was not correctly construed by the Superior Court.

The finding of the court definitely settles any question of untruthfulness in the answer to the seventh paragraph. This seventh paragraph was as follows: "State any existing dispute with or demand made by employees in the last 60 days." The answer was "None."

The trial judge finds that the plaintiff told the exact truth as to this matter.

The eighth question and answer are as follows: "Are you a union shop, and if so, how many and what unions do you recognize?" Ans. "Only so far as the National Foundrymen's Association and National Metal Trades Association."

The trial judge construed this answer to mean that the plaintiff was a union shop and recognized union shops only to the extent that the National Foundrymen's Association or the National Metal Trades Association did so.

The defendant criticises this construction as erroneous. We are unable to see how the court could with reason or propriety have adopted any other construction. That offered by the defendant was clearly not a solution of the matter, especially when we read in this connection the ninth and the tenth answers in this schedule of warranties, and consider the character of the organizations therein referred to. These questions and answers read as follows: "9. If you are a non-union shop state the different lines of craftsmen employed, and the approximate number of each? Ans. Are non-union in forge and blower department; sheet iron department; pattern department. Number employees, about 75, 50 and 20 each, respectively. 10. State what

national and local organizations you are a member of? Ans. National Foundrymen's Association, National Metal Trades Association, and local branch of both associations."

The construction of the eighth answer which the defendant claims should have been adopted by the trial judge is "that the plaintiff's shop was not any more of a union shop than the National Foundrymen's Association and the National Metal Trades Association, and that the plaintiff recognized as unions only the National Foundrymen's Association and the National Metal Trades Association." The weakness of this claim is manifest, when we consider that the organizations thus referred to were not "unions" of workingmen, but organizations of manufacturers created for the purpose, among others, of dealing with trades unions; and it is quite apparent from the tenth question and answer, that the defendant so understood the fact, and could not reasonably have attached any other meaning to the answer of the eighth warranty than that adopted by the court below, to wit, that the plaintiff was a union shop, and recognized unions, only through its membership in the two national associations referred to in the answer.

But if the answer were ambiguous, indefinite, or lacking in clearness of expression, the defendant certainly waived any objection on that score, by issuing its policy on the application containing such defects. "The issuance of a policy on an application containing ambiguous, indefinite, or imperfect answers to questions propounded therein will waive any objections to the answers on the ground of defects therein." 3 Cooley on Insurance, p. 2634.

The defendant further claims that the answer in the seventh paragraph of the "schedule of warranties" is in effect a continuing warranty from the date of the ap-

plication, April 6th, 1906, to the delivery of the policy, May 2d, 1906, and that even if this answer were true when made, if the plaintiff knew of the impending strike trouble on April 21st or 22d, 1906, it then became the plaintiff's duty immediately to inform the defendant of the change of situation, and that its failure to do so vitiated the policy.

It is hardly worth while to consider the validity of this claim as thus stated, in view of facts established on the trial and appearing in the finding of the trial judge. The court has found that the policy of insurance in question was mailed to the plaintiff on the first day of May, and received by the plaintiff at Buffalo on the second day of May, shortly after the moulders in the employ of the plaintiff had on that same morning gone out on a strike; and the court further finds that on the same day, May 2d, the plaintiff mailed its check for $500 to the defendant, as the premium on this policy of insurance, and accompanied this check with a letter acknowledging the receipt of the policy, and containing a statement that the moulders had just gone out that morning on a strike, and that the moulders' union had notified the Buffalo Foundrymen's Association some time ago that they would demand a nine-hour day, and the same rate of pay as stated in their present demand; and the letter contained the further statement that during the conference of the last few days the employees had withdrawn their nine-hour demand, and, although they were in conference all day with the foundrymen, they came to no agreement, and, after an adjournment at 10 o'clock, they met and decided to place this agreement before the foundrymen this morning (May 2d), and insist upon its being signed before returning to work; that the foundrymen had practically agreed to their wage rate, but objected to signing any agreement. The writer further says these matters are very uncertain,

but expresses his private opinion that it will only be a day or two before the men return to work.

It appears that the defendant received the check for $500, enclosed in this letter, and accepted and cashed it with full knowledge of the contents of this letter, and knowing that the moulders in the plaintiff's employ had gone out on a strike on the morning of May 2d, 1906, and that the controversy out of which this strike grew had been in existence for some time prior to May 2d, 1906. The court finds that with such knowledge as this the defendant accepted this premium of $500 and retained it.

These facts make it quite immaterial whether the warranty contained in the answer to the seventh paragraph of this schedule of warranties is or is not a continuing warranty, for, whichever it be, the defendant elected to accept the premium and take the chances of an early settlement of the strike trouble. Instead of assuming at once the position that the warranty was a continuing one, returning the premium, and cancelling the policy, on discovering that the conditions stated in the warranty had not in fact continued throughout the entire period after the application for and before the delivery of the policy, the defendant accepts and retains that premium with full knowledge of this situation. This must be treated as a waiver. 3 Cooley on Insurance, p. 2683. A waiver is implied from this conduct of the defendant, one in which the elements of an estoppel appear. It is a waiver, but it is one the effectiveness of which comes through the application of the principles underlying estoppels. *Bernhard* v. *Rochester German Ins. Co.*, 79 Conn. 388, 65 Atl. 134.

The defendant is, under the circumstances, estopped to claim that this policy is void upon the ground thus suggested by it. Common honesty forbids its claiming a forfeiture of this policy under these circumstances.

But the defendant insists that the * fifteenth agreement of the policy prevents giving any effect to this waiver, and further that this estoppel should have been pleaded to entitle the plaintiff to any claim under it. This latter was not necessary. *Bernhard* v. *Rochester German Ins. Co.,* 79 Conn. 388, 65 Atl. 134. As to the influence of the fifteenth agreement of the policy to prevent any effective operation of the waiver as such, it must be said that, assuming this claim was raised in the court below, as to which we are in doubt, it is based upon a wrong interpretation of that fifteenth agreement, and a complete disregard of the character and scope of this waiver and the estoppel principles underlying it.

Again, the defendant claims errors in the construction of those parts of the policy which relate to the amount recoverable, and to the mode in which such amount should be calculated. This necessitates an examination of the entire contract with some degree of care, and the questions arising, as to the several parts above indicated will be best considered together. The amount of indemnity to the plaintiff stipulated in the agreement is "an amount not exceeding fifty thousand dollars," and this indemnity is "against all direct damage from suspension of operations at their factory plant, situate at Buffalo, N. Y., caused by a strike of their employees and hereinafter called a strike."

This is insurance against "all direct damage from suspension of operations" caused by a strike. Looking a little further at the contract, we find that the liability

---

* This agreement is as follows: "This policy is made and accepted subject to the foregoing stipulations and conditions, together with such other provisions, agreements or conditions as may be endorsed hereon or added hereto. No condition or provision of this policy shall be waived or altered unless by written consent of the President or Secretary of the Company, nor shall notice to any agent nor shall knowledge possessed by any agent or by any other person be held to effect a waiver or change in this contract or in any part of it."

of the defendant is stated as follows: "If a strike occurs during the continuance of this policy, so as to entirely suspend the production of goods, this company shall be liable for loss of net profits and for fixed charges, to an amount not exceeding $166⅔ per day for each working day of such entire suspension, and in case a strike prevents the making of a full daily average production of goods, this company shall be liable for that proportion of the net profits and fixed charges which the production so prevented from being made bears to the average daily product, not exceeding in any case the amount insured. The average daily product shall be determined from the amount of goods last produced during a period of twelve months full work previous to the strike, and losses shall be computed from the day of the occurrence of any strike to such time as the assured is able to produce the former daily average, and shall not be limited by the day of expiration named in this policy."

It appears in this case that the suspension of production was partial only, and the contract makes provision for liability on the part of the insurance company for only a proportion of the net profits and fixed charges, something less than in the case of an entire suspension of production of goods. Now, looking at the contract, how do we find that proportion is to be measured and determined, and how are profits to be ascertained? What profits are to be taken? What is the criterion, what the standard, by which to ascertain whether the insured party has lost profits by the partial suspension of production? It seems to us that the standard is plainly fixed by the contract, and that the net profits of the preceding year furnish the basis of estimate, which is the same as in the case of entire suspension of production. In the latter it is the whole of such loss up to the amount insured. In the case of partial suspension,

it is the entire loss thus suffered up to the amount insured, but what that loss is must be ascertained through the medium of this proportional statement and calculation.  In case of a partial suspension of production, the insurance company is to be liable for such proportion of the net profits and fixed charges as the production so prevented bears to the average daily production, not exceeding the amount insured.  The contract assumes that there is a just and equitable relation between the two, and this relation the insurance company attempts to utilize in determining and adjusting the loss of the assured.  It undertakes to indemnify a party from loss occasioned by a suspension of his business, which, from the very nature of the undertaking, must be attended with and hampered by more or less uncertainty.  However, this is the kind of contract which the parties wished to enter into, and which they did in fact enter into. And, apparently appreciating the difficulties and desiring to present an insurance proposition as free as possible from uncertainty and difficulty in adjustment of loss, they arrange that in case of a partial suspension of production the insurance company shall be liable for such proportion of the net profits and fixed charges as the production so prevented bears to the average daily production, not exceeding, of course, $50,000; the difference between the entire and the partial suspension being only a difference in amount, but computed from and by the same standard.

This is, we think, quite plainly provided for in the contract, and this we think is the interpretation which the trial judge placed upon the language of the contract.

The defendant's contention is that this part of the contract should be interpreted precisely as if it read: "this company shall be liable for that *proportion* of the loss of net profits and fixed charges," etc.  If it were

interpreted in that way, the insurance company would be liable for only a part of the entire loss caused by the partial suspension of production; something quite foreign both to the terms and. good faith of the contract.

The terms of this contract negative any claim of liability for the *actual* loss of net profits, or any proportion of such *actual* loss, in case of a partial suspension of production; there were evidently insuperable objections to any such assumption of liability as that, because of the character of controversy, likely to arise in each case, whether the partial suspension of production related to the most profitable or to the least profitable part of the business of the insured. The mode of calculating the loss actually adopted in the contract, in case of partial suspension of production, avoids such controversy by assuming that the net profits are equally distributed over the entire production. And while this may be a fiction, it is a fiction which the insurance company evidently adopted, when it entered into this contract; and adopted it as an ingenious method of avoiding disputes as to the net profits of the particular portion of the business which was suspended.

Error is also claimed by the defendant as to certain items allowed by the court under the head of "fixed charges." What were "fixed charges" was a question of fact for the trial court to determine from all the evidence. The court has determined what they were and has found the amount of these. The defendant insists that the court is in error as to some of these items. So far as this is a clear question of fact, the finding of the trial court concludes the defendant. What the defendant claims is that the construction which the trial judge put upon this term "fixed charges" was too liberal; that it should have been construed to include only "such charges as would continue if the plaintiff were compelled to shut down, such as interest, taxes, rent, main-

tenance, employees under contract, and such as could not be stopped without detriment to the property," and should include nothing for salaries, office force, or wages of mechanics.

Looking at the kind of indemnity attempted in this policy, it is quite apparent that the fixed charges intended therein were such expenses as must necessarily be incurred, not only to protect and conserve the property of the plant, but also the producing power and capacity of the portion of the plant in which production has been suspended by the strike. The defendant's theory is that the assured should shut down *pro tanto* and not keep the part suspended by the strike in a condition of preparedness. This contention of the defendant is not in harmony with the spirit or the letter of the contract. This contract puts upon the assured the burden of maintaining his plant during the continuance of the strike in such condition that he shall be able to resume his former production without unnecessary delay, after the end of the strike, whether it be ended gradually or abruptly. It is provided in the contract that if the assured, in the judgment of two thirds of the directors of the insurance company, is needlessly prolonging a strike, the company may demand of the assured that it be settled within one month, and, if this is not done, the company may, at its discretion, cancel the policy on five days' notice.

To shut down in whole or in part the works affected by the strike, and to disband the organization of the manufacturing and selling departments proportionately to the loss of production caused by the strike, "would needlessly prolong" the strike period and delay the resumption of ordinary production. And the correctness of this view is emphasized by the fact that by the terms of the contract the loss shall be computed from the date of the strike to such time "as the assured is able

to produce the former daily average, and shall not be limited by the date of the expiration named in this policy." The trial judge held that by "fixed charges" were meant those expenses necessarily incurred in maintaining the organization in such a state of efficiency as would enable it to resume normal production without substantial delay after the strike was ended, or as the strike might be broken by a gradual return of employees. We see no error in this.

The next claim of error is the mode of calculating the liability of the defendant adopted by the court. We have examined with much care the method so adopted, and find nothing worthy of criticism. It is an intelligent, logical mode, clear and just to both assured and assurer, and it is not only entirely in harmony with the terms of the contract, but a proper and just interpretation of that part of it which relates to the mode of calculating such liability.

The defendant's objection to it is that the plaintiff's production for the previous twelve months, and its average daily production for the same period, are stated in dollars and cents, as measured by its sales, instead of by "its production." We think there is no merit in this objection, since the court has found that the average sales per day for the year in question represent with substantial accuracy the average daily product of the plaintiff, measured in dollars and cents. And we repeat, that in considering and determining these matters it must be continually borne in mind what the nature of this contract is. It is an undertaking to indemnify the plaintiff against all direct damage from suspension of operations at their factory, caused by a strike. On the face of it, absolute accuracy is not aimed at, and evidently not contemplated or supposed by either party to be attainable.

It is a novel contract, but its novelty, and the diffi-

culties which the defendant itself has introduced into it, cannot fairly or justly be urged as reasons why the indemnity should not be paid by it, if calculated fairly and with approximate accuracy, which indeed is the only kind of accuracy apparently contemplated by all parties to the contract.

There is no error.

In this opinion the other judges concurred.