# STANDARD PRINTING AND PUBLISHING CO.

*vs.*

## JAMES W. BOTHWELL et al., Receivers.

## JAMES W. BOTHWELL et al., Receivers,

*vs.*

# STANDARD PRINTING AND PUBLISHING CO.

*Strike Insurance—Construction of Policy—Average Fixed Charges—Net Profits—Daily Production—Set-off by Policy Holder—Assessments—Unearned Premiums.*

Where a policy undertook to indemnify the insured against the loss of average daily fixed charges and net profits by reason of a strike of employees, *held* that, under the circumstances, the loss of net profits should be ascertained by comparing such profits during the strike with those earned during the year immediately previous thereto.           pp. 309-311

General or indefinite terms employed in a contract of insurance, as in other contracts, are to be explained by a consideration of the circumstances under which it was executed.    p. 313

The term "fixed charges" has no fixed meaning, but its meaning is more or less general and indefinite, depending somewhat upon the connection in which it is used and the object and intention of the parties by whom it is employed.          p. 314

Depreciation in the value of manufactured product or goods on hand is not a fixed charge.                        p. 312

In a policy insuring against loss of average daily fixed charges by reason of a strike, *held* that the salaries of officials and employees of the insured, whose employment was of much longer duration than the usual period of a strike, and the retention of whose services was necessary to enable the insured promptly to resume normal production at the end of the strike, were to be regarded as fixed charges, but not the compensation of other employees, hired by the day or week, or by piecework, and the retention of whose services was not so necessary.

p. 314

Other necessary expenses incurred in maintaining the efficiency of the insured's organization, besides salaries of the officials and employees whose retention was necessary for this purpose, including charges which spread over the entire establishment, such as rent, insurance, mortgage interest, depreciation, and the like, arising out of the very being of the plant and continuing independently of the operation of the business, were also to be regarded as fixed charges.          pp. 313, 315

The policy providing that the insurer's liability should cease when the average daily production after the strike should become equal to eighty per cent. of the average daily normal production, *held* that, in determining when the average daily production amounted to such eighty per cent., it was proper to take the average daily production for a period of thirty days, this being long enough to indicate that there was, more or less, a permanent revival of business, and that in all probability the average daily production would not thereafter be diminished because of the strike.          p. 316

A policy holder in a mutual insurance company cannot set off a claim on account of a loss against an assessment due by him.          pp. 316-321

A policy holder is not entitled, upon the insolvency of the company, to add the amount of the unearned or return premium to his claim under the policy, and even though the policy contains a provision entitling the holder to a return premium upon the cancellation of the policy, such provision will not apply except when the company is solvent at the time of cancellation.          pp. 321, 322

*Decided June 25th, 1923.*

Appeals from the Circuit Court No. 2 of Baltimore City (STEIN, J.).

Proceeding by Thomas J. Keating, State Insurance Commissioner, against the Employers' Mutual Insurance and Service Company, in which James W. Bothwell and others were appointed receivers of said company. From an order sustaining exceptions to an auditor's report in the matter of

the claim of the Standard Printing and Publishing Company, cross-appeals were taken by said company and by the receivers. Order affirmed in part and reversed in part.

The cause was argued, together with that next following, before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Sylvan Hayes Lauchheimer* and *Malcolm H. Lauchheimer,* for the Standard Printing and Publishing Company.

*Stuart S. Janney* and *Walter L. Clark,* with whom were *Morris A. Soper, J. Purdon Wright* and *George S. Jones* on the brief, for the receivers.

PATTISON, J., delivered the opinion of the Court.

The Employers' Mutual Insurance and Service Company of Maryland, which was incorporated under the laws of this State for the purpose of writing a class of insurance generally called "strike insurance," began to issue policies in August, 1920, but operated for a period less than a year, when its activities were crippled by a series of strikes and labor difficulties, appearing in different industries throughout the United States, but chiefly in the printing industry.

It was a mutual company and its policy holders and members were subject to an assessment equal to the deposit premium, if such assessment was required for the payment of losses. And because of losses, and the many claims filed against the company, the board of directors found it necessary to levy, and did levy an assessment of one hundred per cent. of the deposit premium upon each of its policy holders. But only a small number of them paid their assessment, either in full or in part, leaving unpaid thereon, in the aggregate, approximately one-half million dollars. To prevent further loss the outstanding policies were in the last days of October, 1921, cancelled, and, as a result thereof, claims were filed for unearned premiums claimed to be due by reason of such cancellation.

On the 9th day of November of the last named year, while the company was in the condition mentioned, receivers were appointed for it upon the application of the Insurance Commissioner of Maryland. At that time the assets of the company consisted of five hundred thousand dollars, in cash, and one million dollars owing to it by the policy holders on the assessments levied against them, and by "The Lloyds of London," and the Excess Reinsurance Company of London, as reinsurance, making the total assets of the company approximately one and one-half million dollars. Against this sum have been filed with the receivers claims aggregating about seven million dollars.

Upon their appointment the receivers proceeded with their task of winding up the affairs of the company, and to this end an auditor was appointed by the court authorized to take testimony in connection with the proof of various claims of its policy holders. Accountants were also employed by the receivers, under the order of the court, to examine the books of the various companies and persons insured to obtain the necessary information regarding fixed charges and net profits and other matters in connection with the claims.

In making these investigations, and in the hearings had in connection therewith, a number of questions arose involving the construction of certain provisions of the policies affecting alike the rights of all the claimants thereunder, and it was thought best by the receivers that they should receive directions from the court as to such questions. Therefore two claims were selected as test cases upon which appropriate proceedings were instituted, in which the views and direction of the court in respect to such questions were sought to guide the receivers in their dealing with all the claimants.

The two claims selected were the Standard Printing and Publishing Company and the Fleet-McGinley Company.

The case of the Standard Printing and Publishing Company, the one now before us, was submitted to the court upon an agreed statement of facts which contains the policy of insurance under which it was insured; the by-laws of that

company, and its profits and loss statements: First—For the year ending December 31, 1920; Second—For the four months preceding the strike; Third—For the period of the strike commencing with May and ending with September, 1921.

It also contains schedules of "fixed charges" filed by the receivers and claimant respectively, commencing the 1st day of May, and ending September 30th, 1921, both inclusive, and also statements showing monthly sales made by the insured between May 1st, 1920, and November 1st, 1921.

The provisions of the policy which are important in passing upon the questions presented, are the following:

"Indemnity.

"In consideration of the statements set forth in the declarations hereto attached, and hereby made a part hereof, and of the premium deposit specified herein (which deposit is subject to adjustment), and that the Assured, by acceptance of this policy, does also bind himself, his executors or administrators, to pay all such further sums as may from time to time be assessed on this policy by the directors of said company, in conformity with the articles of incorporation and by-laws of this company and the laws of the State of Maryland; provided that such further sums shall not in any case be more in any one policy year · than an amount equal to the premium deposit for such policy year, does hereby agree to indemnify the individual firm or corporation named in Statement 1 of the declarations * * * for the period of one year * * * against the direct, actual loss of average daily fixed charges and/or net profits, as hereinafter defined, caused by a strike of all or part of the employees of the Assured, * * * and sustained during the period of such strike, said strike beginning while this policy is in force (except during the first fifteen days as hereinafter provided) and continuing for a period not exceeding the three hundred next succeeding working days, at a rate not exceeding three hundred

dollars ($300.00) per diem, and not exceeding an aggregate total indemnity of ninety thousand dollars ($90,000.00) during· any policy year."

"Company's Liability.

"B. If a strike occurs during the term of this policy so as to cause a partial or a total prevention of production, the company shall be liable for 80% of the direct actual loss of fixed charges and/or net profits sustained, not exceeding in either case the per diem indemnity or the total indemnity herein stated; but the company shall not be liable for any consequential loss whatever; nor shall the company in any case be liable for further loss hereunder when after a strike at the plant of the Assured covered by this policy, causing a total prevention of production, the average daily production at said plant becomes equal to eighty (80%) per cent. of the average daily normal production, nor shall the company be liable for further loss hereunder when, after a strike at said plant causing a partial prevention of production, the average daily production of that part which was interrupted by the strike equals eighty (80%) per cent. of the proportion so interrupted."

"Payment of Indemnity.

"I. This contract is one of indemnity only, and there shall be no liability unless there has been actual loss. If the industry in which the plant herein described is engaged becomes materially and generally affected by increase or decrease in business activity during the period of a strike at said plant, it is the intent of this policy that, in the absence of direct proof of the actual, direct loss caused by and during the period of such strike, ascertainment of the actual loss shall be arrived at through due consideration of what such increase or decrease shows might reasonably have been expected during the period of such strike; but liability hereunder shall in no event exceed the per diem indemnity or the total indemnity herein stated."

There were four questions presented to the court below, all of which are presented to this Court on appeal.

The first question is, How is the actual loss of average daily fixed charges and/or net profits insured against to be ascertained?

The consideration of this question may very properly be divided in two subdivisions.

First—The period to be used in calculating "the average," and Second—The element which makes up "fixed charges."

What would have been the *actual* net profits of the business during the strike period, had the strike not occurred, is impossible of exact ascertainment, consequently the amount of loss caused by the strike, is more or less speculative.

The loss of net profits may be, and at times is, estimated by selecting some other period of time in which the insured has been engaged in business most nearly approaching the strike period in similarity of conditions, and by ascertaining the average daily net profits of that period; and if it be found that the average daily net profits of the selected period are greater than those earned during the strike period, because of the strike, the difference therein is the loss of average daily net profits during the period of the strike, subject of course to any special facts affecting the business of one and not the other of said periods, indicating with reasonable certainty that the average daily net profits of the period selected would be increased or diminished during the period of the strike by those facts.

No unvarying general rule can be established as to the period of time to be selected as a basis upon which the loss of profits during the strike period may be estimated, applicable to all cases, because of the varying circumstances and conditions incident thereto. It is only in those cases of like character, and conditions that any general rule can be established applicable to all.

The claims filed against the receivers in this case are very similar. The policies under which the claims were filed are practically the same in form, and ninety (90%) per cent. of

them were issued to those engaged in the printing business, who were alike affected by the printers' strike of 1921. It was because of their great similarity that the court below was asked, in passing upon the exceptions filed to the claim of the Standard Printing and Publishing Co., to lay down some general rules, applicable to all the cases, by which the receivers may be guided and controlled in distributing the funds in their hands.

The counsel for the receivers contend that the first four months of the year 1921 should be selected and used in estimating what would have been the average daily net profits during the strike period had there been no strike. The reason given therefor being that this, the nearest period to the strike, showed a falling off of business, the sales being largest in January and smallest in April, the month immediately preceding the strike. That such falling off of business started in the latter part of 1920, and continued through the first four months of 1921, which they claim indicated that the period suggested by them approached, as near as any other time, what would have been the business conditions of the strike period immediately following, in the absence of a strike. There was nothing at least to indicate that it would be more.

The claimant, however, meets this contention by saying that the four months named by the receivers was not only too short a period upon which to estimate the profits of the strike period with fairness to it, but such period was at a time of great fluctuation and depression in business, and when the sales of the claimant were at their lowest ebb.

The counsel of the claimant contend that, in addition to the first four months of 1921, the twelve months of the year 1920 should be included in the period to be used, because, as stated by them, it would include the fiscal year of the Standard Printing and Publishing Co. ending with the 31st day of December, 1920, and the parties would thereby have the benefit of the known net profits of that year.

In reply to claimant's contention that the sixteen months period immediately preceding the strike should be used, the receivers state that the first and major part of the year 1920 was abnormally good and if that year was included within the period it would produce a result unfair to the insurance company.

The court refused to accept either of the contentions made by the parties and fixed the year commencing May 1, 1920, and ending with the 30th day of April, 1921, as the period to be used as a basis in estimating the loss of the average daily "fixed charges and/or average daily net profits" during the period of the strike.

The court in selecting the period mentioned largely avoided the apprehended unfair result which the parties said would follow if the period suggested by the other were adopted.

It refused to accept the four month period immediately preceding the strike, because of the extremely low average of daily profits that would have resulted therefrom, and also declined to accept the sixteen month period, as it would have made the daily average profits too high because of the inclusion within that period of six or eight months of greatly abnormal profits.

In the period selected by the court, were included not only the months of low profits but several months of very large profits. This, we think, had the affect of increasing the average daily net profits of the period selected, to an amount sufficient to meet any well founded contemplated increased profits of the strike period that immediately followed.

The period selected by the court below meets with our approval, as it will, in our opinion, based upon the record before us, best serve as a basis for estimating the loss of average daily profits and "fixed charges."

We will now consider the question as to what are "fixed charges" within the meaning of the policy.

The receivers and the claimant each filed a schedule of "fixed charges" which, it seems, they thought should be paid or allowed under the policy.

In each of the schedules are found the following items: "Rent," $1,741.00; "Office and Officers' Salaries," $7,-941.35; "Taxes," $3,804.94; "Heat and Light," $361.74; "Insurance," $1,500.00.; "Bluefield Office," $26.21.

In the receivers' schedule are found the following items which do not appear in the claimant's schedule: "Power," $528.58; "Telephone and Telegraph," $552.50; "Salemen's Salaries," $7,100.00; "Depreciation," $3,954.50.

And in the claimant's schedules are found these items, which do not appear in the receivers' schedule: "Interest," $1,598.13; "Miscellaneous Expenses," $1,703.57; "Postage," $422.91; "Repairs," $660.28; "Traveling Expenses," $8,-545.54.

The difference in the aggregate of the two schedules is $1,383.50, and the difference in the daily average is $9.32.

No doubt the "Miscellaneous Expenses" found in the claimant's schedule include some of the items found in the receivers' schedule. As there is no item of "Salesman's Salaries" found in the claimant's schedule, it is most probable that such item is included in the item "Traveling Expenses" found in the claimant's schedule.

Reference has been made to these schedules to show that the parties, the claimant and receivers did not at that time differ so widely in what they regarded as "fixed charges" and also to show that in the receivers' schedule is found the item "Depreciation," which, under that name, is not found in the claimant's schedule, although now the claimant contends that depreciation is a "fixed charge" while the receivers contend that it is not.

It is claimed by the claimant, and it would so seem from the record before us, that the item "Depreciation," which was disallowed by the court below, was understood by it to mean depreciation in the value of manufactured articles and not the depreciation of the plant. If this be so, the court was absolutely right in so holding. The depreciation in the value of the manufactured product or goods on hand was certainly not a "fixed charge."

As the policy does not define "fixed charges," what is meant thereby, is left to us to decide.

*Bassett on Accountancy* on page 244, cited by the receivers in their brief, defines "fixed charges" as those "charges which spread over the entire establishment, such as rent, insurance, taxes, mortgage interest, depreciation and the like, according to whether the plant is leased or owned. * * * 'Fixed charges' arise out of the very being of the plant and continue whether or not the business is operated."

The only case to which our attention has been called, and the only one that we have been able to find after diligent research, in which "fixed charges" have been defined in an action brought upon an indemnity policy insuring against loss of "fixed charges" caused by the strike, is the case of *Buffalo Forge Co.* v. *Mutual Security Co.,* 83 Conn. 393. In that case the court approved of and adopted the trial court's definition that by "fixed charges" were meant those expenses necessarily incurred in maintaining the organization in such a state of efficiency as would enable it to resume normal production without substantial delay after the strike was ended or as the strike might be broken by a gradual return of employees."

It is a well settled rule of law that contracts of insurance, like all other contracts, are to be considered according to the sense and meaning of the terms which the parties have used them, and if they are clear and unambiguous, these terms are to be taken and understood in their plain, ordinary and popular sense." *Mutual Life Insurance Company* v. *Murray,* 111 Md. 660; *Palatine Insurance Co.* v. *O'Brien,* 107 Md. 354; *Bank of St. Mary's* v. *The Maryland Casualty Co.,* 142 Md. 454. But it is also "a principle of universal application, that, in order to arrive at the intention of the parties, the contract itself must be read in the light of the circumstances under which it was entered into. *General* or *indefinite* terms employed in the contract may be thus explained or restricted in their meaning and application; and the contract must be so construed as to give it such effect, and none other,

.as the parties intended at the time it was made." *Bank* v. *Gerke,* 68 Md. 456.

The term "fixed charges" has, it seems, no well defined meaning. Its meaning is more or less general and in-definite, depending somewhat upon the connection in which it is used and the object and intention of the parties by whom it is employed.

When used in a contract like the one before us, it may having a different meaning from what it would have if used in a different connection or with an entirely different object or purpose. The term was here used by the parties in a contract whereby it was their object, purpose and intention to give to the insured indemnity against the loss therein mentioned, caused by strike.

The insured was not insured against loss of the average daily net profits alone, but also against loss of average daily "fixed charges."

The insured, no doubt, had in its employment at the time of the strike officers and employees whose term of office or employment was of much longer duration than the usual period of a strike, and whose services the insured could not have dispensed with without loss to it and without rendering it unable to resume promptly normal production at the end of the strike, or to continue the business during the period of partial production.

The salaries of such officials and employees should, we think, be included in the "fixed charges" provided for in the policy. But the compensation paid to other employees who were hired by the day, or the week, or by piecework, whose services went into the actual production of the article pro-duced or manufactured, and whose services could have been dispensed with without impairing the efficiency of the organi-zation by rendering it unable to resume normal production without substantial delay, or to continue the business through the period of partial production, should not, we think, be in-cluded among the "fixed charges."

The salaries of those mentioned, with other necessary expenses incurred in maintaining the efficiency of the insured's organization to the extent we have stated, including the charges specially mentioned in Bassett's definition of "fixed charges," are the "fixed charges" that were intended by the parties to be covered by the policy.

The next question is : When does the liability for loss end ?

The policy fixes the end of each of three periods as a time at which the liability of the insurer under it ceases.

First.    For all loss suffered by the insured after the strike has lasted 300 working days, within the time for which the policy was issued.

Second.    When the maximum amount named in the policy as payable thereunder has been paid to the insured.

Third.    When in case of total prevention of production the *average* daily production thereafter becomes equal to eighty (80%) per cent. of the *average* daily normal production ; or in case of partial prevention of production, when the *average* daily production of that part which was interrupted by the strike thereafter equals eighty (80%) per cent. of the proportion so interrupted.

In this case we are concerned only in the third of these culminating periods.

The question is first presented, how is the average daily production during the strike period to be ascertained ?

The answer to this question is that such average daily production for that time may be ascertained by the method that we have suggested should be employed in estimating the average daily net profits during the same period.    The period of comparison to be the same.

The next question asked is, How may it be ascertained when the average daily production, at any time during the strike, amounts to eighty (80%) per cent. of the average normal daily production ?

The liability of the insurer under the policy does not end when the daily production reaches eighty (80%) per cent. of

the average normal daily production, but when the *average* daily production reaches that point. Consequently the liability of the insurer does not end until a period is reached where the average daily production of that period is equal to the average daily normal production. The period should be of sufficient duration to indicate that the strike in effect was abating and that the business of the company would not again be diminished because of it.

The policy does not state the length of the period to be used in ascertaining the average, but the court below, as we understand its opinion, fixes the period at thirty days. This, we think, upon the facts before us, was long enough to indicate that there was, more or less, a permanent revival of business, and that in all probability the average daily production would not thereafter be diminished because of the strike.

The third question presented by this appeal relates to the unpaid assessments made upon the policy holder.

As stated by the parties, no question is raised as to the validity of the assessments which were made pursuant to the policy, nor as to the insured's liability for their payment.

The only question relating thereto is whether the policy holder shall be permitted to pay and satisfy the amount owing upon the assessment by deducting the amount of it from the loss sustained by the policy holder under its policy, if such loss exceeds the amount owing by the policy holder upon the assessment; or if not, shall the policy holder be allowed to set off such loss against the amount owing by it upon the assessment.

It is said in 22 *Cyc.*, page 1425, "the member (of a mutual insurance company) cannot set off as against his liability on a premium note any claim he may have against the company for a loss under his policy."

In support of this declaration of the law the author cites *Lawrence v. Nelson*, 21 N. Y. 158. In that case, as in this, the question was, could the defendants, policy holders of a mutual company, set off their loss under the policy against

their premium note.   The court said if they could it was be-
cause it was equitable and just to do so and no rights of third
persons had intervened.   The court then proceeded to say:

"The party has entered voluntarily into engagements with
others modifying, or entirely changing, as between them-
selves, the effect or application of the general rules of law
or equity in regard to set-off.   In a company of mutual in-
surers each sufferer is bound to make compensation as well
as to receive it.   He occupies the double relation of debtor
and creditor, and it would be inequitable to allow him, when
the funds of the company are not adequate to pay all losses,
to set off his entire demand, thereby getting more than his
share of and decreasing a common fund to which all the
creditors, *pro rata,* are entitled.   Each member is interested
in the premiums, as well as losses, of all the others, and the
premium paid by each is saddled, as it were, with its propor-
tionate share of the claims of all others.   The premium,
whether paid or secured to be paid, is withdrawn from his
control, in contemplation of law, and placed in a common
fund, not subject to his claims only, but those of all others in
the company, he in turn having a similar claim on the pre-
miums of his associates.   The members of the association
virtually agree to insure each other and provide a common
fund to indemnify in case of loss.   As all have contributed
to this fund, they have a community of interest in it, and
each member, having his proportionate share of the losses, is
entitled to his proportionate share of the profits, if any are
realized.   It may be that one member may draw from the pre-
miums paid by other members into the common fund, if the
association be prosperous, not only the amount of his losses,
but as large a proportional share of profits as those whose
transactions with the company created no loss at all.   In
such a case, if insolvency eventually overtakes the association,
it would be highly unjust to allow him to set off a loss against
premiums that happened to be unpaid, and that should be
placed in the common fund.   Indeed, when the assets of the

company are inadequate to the payment of the losses of all its members, the effect of permitting a sufferer to set off his loss in full against his premium notes (which are his contribution to the means of the company) is not only to confer a benefit without making compensation, but to take from the shares of his associate sufferer in the common fund, to which fund he and they are ratably entitled. Undoubtedly a premium paid, or agreed to be paid, by a member of a company formed on the mutual principle must bear its proportionate share of the losses of the company, and cannot be applied exclusively to the individual debt of the party owing or paying it. So long as the company be solvent no practical injury would result from setting off a loss against the premium, as no preference would be given to one member or creditor over the others, for all would be paid in full. But if the association were insolvent, to permit the set-off to be made would be to give an unjust preference to one creditor over the others." See also *Hiller* v. *Allegany,* 3 Pa. St. 470; *North Carolina Mutual Life Insurance Co.* v. *John H. Powell,* 71 N. C. 389 ; *Stone, Receiver,* v. *New Jersey & Hudson River Ry. & Ferry Co.,* 75 N. J. Law, 172; *Stone* v. *Old Colony Street Ry. Co.* 212 Mass. 459, and other cases.

In *Stone* v. *Old Colony Street Ry. Co.* (*supra*) the Court said, "the assessments when collected form a fund for the benefit of all the policy holders, including the defendant whose demands comprise a part of the indebtedness which made the assessment necessary. The defendant received the benefit of the insurance of the subsidiary companies as a party insured, while it also became an insurer for the protection and benefit of the other members. A set-off would confer upon it a preference to the disadvantage of other creditors and policy holders and permit it to appropriate exclusively the amount claimed in partial payment of its own demands against the insolvent, and to this extent the defendant would be relieved from the obligations of an insurer."

The policy holder's right of set off in cases against mutual companies has never been considered by this Court, so far as we are able to recall. But the claimant contends that this question has been practically settled favorably to its contention by this Court in the two cases of *Colton v. Drovers' Building & Loan Association,* 90 Md., page 91, and *Cahill* v. *Original Big Gun, Etc., Asso.,* 94 Md., page 353.

In the first of these cases, in which the opinion of the Court was delivered by Chief Judge Boyd, the appellants were appointed receivers of the South Baltimore Bank. At the time the bill asking for the appointment of receivers was filed, the bank held the appellee's promissory note for one thousand dollars, and the appellee had a deposit with the bank, amounting to $457.25. At the maturity of the note the appellee tendered the receivers $642.75, the difference between the amount of the note and the amount of its deposit, and demanded the note, but the receivers refused to receive the money and to surrender the note, claiming that the appellee could not set off the amount of its deposits against the note owed by it to the receivers.

The Court held that the ordinary relation of debtor and creditor existed between the appellant and the appellee. The appellee was indebted to the receivers of the insolvent bank in the sum of $1,000.00 upon the note, and the receivers were indebted to the appellee to the extent of its deposit. The rights of others were in no wise involved therein.

In *Cahill* v. *Original Big Gun, Etc.* (*supra*) the suit was brought by the appellee, a creditor of the South Baltimore Bank (the bank involved in *Colton* v. *Drover Building & Loan Asso., supra*) against the appellant, who was both a stockholder and creditor of that bank.

The charter of the bank contained a provision that its stockholders and directors should be liable to the amount of their respective shares of stock of the bank, for its debts and liabilities.

The question presented in that case was whether the stockholders of the insolvent corporation could set off the indebtedness of the corporation to him against his liability under the charter.

The Court, speaking through JUDGE BRISCOE, said:

"In the recent case of *Colton* v. *Mayer,* 90 Md. 711, this Court held, in construing the provisions of the charter of the South Baltimore Bank, that the statutory liability of its stockholders was directly to the creditors and not to the receivers for the benefit of creditors and that the fund arising from such liability is in no sense a corporate asset of the corporation and the receivers have no interest in it.

"The liability of the stockholder then under the statute having been settled, as a debt due from the stockholder to the creditor, there can be no valid reason, it seems to us, why a stockholder who is also a creditor should not be entitled as a matter of equity to set up as an equitable defense, the debt of the bank to him against his own liability. Mr. Cooke in his book on Corporations, vol. 1, sec. 225 (c) says that it has been held that where the statute creates a fund out of which the creditors are to be paid ratably, then the stockholder cannot set off an indebtedness of the corporation to him. He must pay in what the statute requires and then prove his claim against the corporation like any other creditor. But where the shareholder's liability by statute is immediate and personal and several and any creditor may sue any shareholder, then, the shareholder may set off a debt, owing to him from the corporation, when he is sued by a corporate creditor. In 1 *Beach on Private Corporations,* sec. 727, it is said: 'But if the statute imposes upon shareholders a personal liability to creditors, immediate and several, so that any creditor may institute an independent action against any shareholder for the enforcement of corporate debts then a defendant shareholder may set off debts due from the company to himself.' "

In the case just cited Cahill was not indebted to the *bank* but to the *creditors of the bank* of whom he was one; and it was because of that fact that this Court there held the defendant entitled "as a matter of equity to set up as an equitable defense the debt of the bank to him against his own liability."

That this was the reason for the Court so holding is shown by its quoting with approval what is said in *Cook on Corporations* "that where the statute (or the policy as in the case before us) creates a fund out of which the creditors are to be paid ratably, then the stockholders (or policy holders in a mutual company) cannot set off an indebtedness of the corporation."

The two cases in this Court relied upon by the claimant in support of its contention, differ widely from the case now under consideration.

The fund of which the assessment against the claimant when collected will form a part, is a common fund in which the claimant has only a qualified interest in common with other policy holders.

Neither the fund, or any part of it, is subject to its control, but is to be paid ratably to those policy holders who have suffered loss within the meaning of their policies. To allow the claimant to set off a loss against what it is owing upon its assessment when others have wholly or partially paid theirs into a fund which in part will be applied to the payment of the claimant's claim in whole or in part, would not only be very unjust to other policy holders, but it would be giving him an unwarranted preference. We, therefore, agree with the court below, that such set off should not be allowed the claimant.

The fourth and last question for our consideration, is, shall the unearned or return premiums, as referred to in the opinion of the court and the briefs of counsel, "be added to the claim under the policy" or shall they remain in the fund in which they were placed and be applied to the payment of the losses suffered by the policy holders?

The court, in *Commonwealth* v. *Massachusetts Insurance Co.*, 112 Mass. 124, in speaking upon the subject said, quoting from the syllabus, "when the losses * * * suffered by a mutual * * * insurance company render it insolvent and requires an assessment to the full amount * * * the holder of an unexpired policy, the cancellation of which has been rendered necessary by such insolvency, has no right of set off, or of recoupment or claim for return of premium or for damages on account of the unexpired term of his policy." And this seems to be the law, even though the policy contain the provision entitling its holder to a return premium upon the cancellation of the policy, as such provision would apply only where the company was solvent when the policy was cancelled.

As was said in the case from which we have just quoted, the fund is "pledged to satisfy and make good the losses that have occurred. Each one in turn who suffers loss is entitled to the full benefit of this pledge, according to the state of those funds when his loss occurs; this forbids any reduction of the fund, when the whole is required to cover losses, either by apportionment, set off or otherwise." *Vanatta* v. *New Jersey Mutual Life Insurance Co.*, 31 N. J. Equity, 15; *Roegner, Receiver of Equitable Mutual Fire Ins. Corporation* v. *Hubbard*, 167 N. Y. 301; *Commonwealth* v. *Mass. Life Ins. Co.*, 112 Mass. 116; *Hillier* v. *Allegany Co. Mutual Ins. Co.*, 3 Pa. 470.

The court below held that the "return premiums," as it called them, could be added to the claim under the policy. In this finding we think the court was in error, as in our opinion they should remain in the fund and be applied to the payment of the claims of the policy holders suffering loss under their policies.

The appeal in this case is from an order passed by the court below, by which the exceptions filed to the auditor's report in the matter of the Fleet-McGinley Co. were sustained and the report referred "back to the auditor with instructions to allow it and other claims of the policy holders

for loss under other policies, in accordance with the rules set out in the above opinion.

It will be observed, that the name of the claimant in the above order is that of the Fleet-McGinley Co. when it should have been the Standard Printing & Publishing Co. This we have assumed was a typographical error and have so treated it, as did the appellant in its order for an appeal.

Though neither the audit to which exceptions were taken and sustained, nor the items allowed therein to the plaintiff, are found in the record, we think we may assume from the state of the record, and the directions given by the court, that it acted properly in sustaining the exceptions and remanding the case to the auditor for re-statement of the audit or account, but as we differ with the court in at least one of the rules laid down by it, the order will have to be affirmed in part and reversed in part and the case remanded that the auditor may be directed to distribute the funds as herein stated.

The court in its opinion stated that because of the large amount to be distributed and the great number of policy holders, he had appointed counsel to represent the claimant and had directed them to enter a cross-appeal "to save exceptions of separate policy holders." A cross-appeal was therefore taken in this case.

The order appealed from will be affirmed in part and reversed in part and the case remanded for the purpose stated above.

> *Order affirmed in part and reversed in part and case remanded, the costs to be paid out of the fund.*